UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS

| | |
|---|---|
| JULIUS MCQUEEN, )<br>     Appellant, )<br>)<br>v.      )<br>)<br>THOMAS E. WHITE, SECRETARY, )<br>U.S. DEPARTMENT OF THE ARMY )<br>)<br>     Appellee Agency. )<br>——————————————————— ) | EEOC Appeal No. 01A46062<br><br>Agency No. BXHMFO016130290 |

## APPELLANT'S BRIEF IN SUPPORT OF APPEAL

COMES NOW, Appellant, Julius McQueen, by and through the undersigned counsel of record, and pursuant to 29 C.F.R. 1614.403(d), and hereby submits this Brief in Support of his Appeal of the Final Agency Decision issued by the U.S. Department of the Army (hereinafter "Agency"), on August 2, 2004.

### I. INTRODUCTION

This case involves the Agency's non-selection of Appellant, an African-American individual, for a supervisory position in the mailroom where he had worked for seven years, due to race discrimination and in violation of Title VII of the Civil Rights of 1964, as amended, 42 U.S.C. §§ 2000e et seq. Instead, Agency selected the only white applicant for the supervisory position, a newly-hired individual whom Appellant had been assigned to train.

The Final Agency Decision stated that Appellant met his prima facie burden of showing race discrimination, but that the Appellant failed to refute the Agency's legitimate, non-discriminatory reason for his non-selection. Appellant seeks a de novo review of the evidence contained in the Agency file, which will establish by a preponderance of the evidence that the Agency discriminated

05 1650 FILED

AUG 1 6 2005

NANCY MAYER WHITTINGTON, CLERK



against Appellant due to his race when he was not selected for the supervisory mailroom position.

## II. STATEMENT OF FACTS

In 1994, Appellant (hereinafter "Mr. McQueen") began working for the 43rd Signal Battalion, Network Service Center of the United States Army in Heidelberg, Germany, as a Mail and File Clerk, GS-0305-04. (See Report of Investigation ("ROI"), p.99). Throughout his employment with the Agency, Mr. McQueen received only "Excellence" ratings on his performance appraisals. Further, he received cash awards for his performance on the job. (See ROI, p.99). Due to this exemplary performance and experience in the mailroom, the Agency assigned Mr. McQueen to the leadership role of training incoming personnel in mailroom duties. (See id.).

In November of 2000, the Agency hired Mr. David Giddens, who became the only white mailroom clerk at his duty station. (See id.). Mr. McQueen was responsible for training Mr. Giddens. (See ROI, p.99). Immediately after Mr. Giddens' employment began, the Agency permitted Mr. Giddens to participate in meetings with management on mailroom-related issues, although Mr. McQueen and the other mailroom clerks were excluded from these meetings.

In addition, the Agency allowed Mr. Giddens to apply for a Top Secret security clearance after he had worked in the office for only one week. (See id.). When Mr. McQueen requested the opportunity to upgrade his security clearance to Top Secret, Ms. Anne Fischer, Supervisory Management Assistant, and Mr. Ronald Zedalis, Security Assistant/Chief of NATO Sub registry, denied his request. (See id.). When Mr. McQueen questioned Ms. Fischer about this disparate treatment, she said that she would provide an answer at a later date but never did. (See ROI, p. 99).

In January of 2001, about two months after Mr. Giddens' arrival on duty, a Lead Mail and File Clerk position (GS-0305-05) became available at the 43rd Signal Battalion. The Vacancy

Announcement indicated that the Lead Mail and File Clerk (GS-0305-05) position required at least one (1) year of specialized experience, which can only be acquired by actually working in the Agency's mailroom. (See ROI, p.187, Experience and Education Requirements from OPM Qualification Standards Handbook, ROI, p.144). Specialized experiences serve to equip the applicant "with the particular knowledge, skills, and abilities (KSA's) to perform successfully the duties of the position, and that is typically in or related to the position to be filled." (See id.).

This requirement of specialized experience in the mailroom was commensurate with the Position Description, which established that 75% of the duties and responsibilities of the position involve a variety of specialized functions, abilities and other technical attributes consistent with the mailroom classification series. (See ROI, pp.187-192). The remaining 25% of the job duties and responsibilities are those of a supervisor/team leader and require leadership skills. (See ROI, pp. 187-192). The leadership duties include functioning as a bridge between mailroom employees and Agency managment. (See ROI, p.178).

When the position became available, Ms. Fischer advised all the mail room employees of their potential candidacy. (See ROI, p. 99). Mr. McQueen was one of four black candidates for the position, for which Mr. Giddens also applied. (See ROI, p.151). Typically, when federal applicants lack the basic qualifications for a position, their applications are not presented to a selection panel for consideration. Of the five candidates presented to the selection panel, only the selectee, Mr. Giddens, lacked the requisite one-year of specialized knowledge. (See ROI, p.151). In fact, Mr. Giddens has less experience than any of the black candidates presented to the panel, especially Mr. McQueen. Overall, Mr. McQueen possessed the greatest amount of relevant experience for the position, due not only to his length of mailroom service, but also to his leadership role as trainer for

new employees.  (See ROI, p.161.).

| CANDIDATE | POSTAL EXPERIENCE | RACE |
|---|---|---|
| Carson | 7 years | Black |
| Giddens (selectee) | 5 months | White |
| Hebert | 6 years | Black |
| Ingram | 19 months | Black |
| McQueen | 7 years | Black |

(Id.).

The Agency assembled a selection panel to rate and rank these candidates for the Lead Mail and File Clerk (GS-0305-05) position.  The panel consisted of Ms. Anne Fischer (Race: Slavic-Croatian), Supervisory Management Assistant; Ms. Jeanne Wasko (Race: Caucasian), Senior Management Advisor; and Mr. Frank Robert Waitt (Race: Caucasian), Chief of the Network Operations Branch, selecting official.  (See ROI, p.2).  Mr. Waitt served in a dual capacity as both a selection panel member and as the Selecting Official.  (See id.).  Chief Kendal Russell apparently served as the recommending official and was not on the selection panel.  (See ROI, p.7).  Mr. Russell left his recommendation to select Mr. Giddens with Ms. Fischer and Mr. Waitt before he took leave, and the selection took place during his absence.  (See id.).

The selection panel members each assigned a numerical score on a ten-point scale to each candidate on various selection criteria.  (See ROI, p.9, 167).  The Agency has alleged that these numerical scores established that it selected the best candidate for the Lead Mail and File Clerk (GS-0305-05) position.  (See ROI, p.9, 167).  However, Mr. Ronald Zedalis, Security Assistant/Chief of NATO Sub registry, has admitted that he had "a great deal of influence" in the selection of Mr. Giddens, although Mr. Zedalis was not a selection panel member and had no official role in the

Page -4-

selection process. (See ROI, p.5). Mr. Zedalis was responsible for delivering assignments from Ms. Fischer to the mailroom employees. (See ROI, p.7). However, he did feel compelled to "talk up" Mr. Giddens to Ms. Fischer and Mr. Russell. (See id.).

Further, the selection criteria used by the panel failed to include any of the required skills for the Lead Mail and File Clerk (GS-0305-05) position outlined in the Vacancy Announcement, the Position Description or the Qualification Standards Handbook. (See ROI, p.3, 9, 187). The selection criteria used by the panel placed no value upon actual experience in the mailroom even though the position description explicitly demanded this experience. (See id.). Panel member Ms. Fischer admitted that she did not consider mail room experience at all in making her selection. (See ROI, p.6). Indeed, the selection criteria failed to address any of the technical qualifications for the position at issue, in which each of the black candidates and particularly Mr. McQueen far exceeded the selectee. (See id.).

In fact, the Agency's own EEO investigator found that "the record contains no explanation as to the business necessity for employing such selection criteria." (See Analysis of Findings, p.5, Jon Steinhilber). In addition, the use of criteria such as "Potential for Growth" was deemed entirely subjective by the Agency's own EEO Investigator, "because of the lack of specific criteria used in assigning a numerical rating." (See ROI, p.3). Further, the Agency did not conduct interviews with the candidates during its selection process. (See ROI, p. 2). As a result, the significant experience that made Mr. McQueen the most-qualified candidate for the Lead Mail and File Clerk (GS-0305-05) position was simply disregarded by the selection panel. (See ROI, p.4).

Ms. Fischer also confided in her friend, Mr. Donald Baker, former employee of the 43rd Signal Battalion, about the selection process. See ROI, p.9. Mr. Baker testified that he and Ms.

Fischer had numerous conversations regarding the respective qualifications of the candidates for the position. (See ROI, p.88). Ms. Fischer first indicated to Mr. Baker that she intended to select Mr. McQueen. (See id.). When Mr. Giddens was selected, Mr. Baker questioned Ms. Fischer regarding the selection. (See id.). Ms. Fischer admitted to making a "bad" mistake with her selection, while additionally admitting to being influenced by Mr. Russell to select Mr. Giddens. (See ROI, p.9). Ms. Fischer stated that Mr. Russell instructed her to give Mr. McQueen and his black co-workers a lower rating on at least one selection criterion and to give the selectee only top scores on all criteria. (See id.).

Panel member Ms. Wasko stated in her affidavit that the selectee was chosen because of his leadership abilities. (See ROI, p. 138.). The Agency EEO investigator notes in his report that Ms. Wasko "should have been painfully aware that there is absolutely no team leader/leadership requirement necessary as a prerequisite for the position. The position is clearly clerical requiring extensive mailroom knowledge and experience." (See ROI, p. 126). He further noted that Ms. Fischer appeared to be taking the "standard agency Team Leader position" in her testimony by "emphasizing a qualification which is not required but which will substantiate and justify the selection of the selectee." (See id.).

Ms. Wasko also confessed that Mr. McQueen was the second choice of the panel for the position after the selectee. (See ROI, p. 8). The Agency EEO investigator commented on this statement by noting, "it is interesting to note that her testimony attempts to justify the selection of a candidate who did not possess even the minimum requirements of a GS-5 position, and thus should not have been a candidate at all. She should have been aware of this blatant error. This lends credence to the Aggrieved's complaint that management as a whole conspired in every way possible

to insure that the only white candidate, however unqualified, would be selected." (See ROI, p. 126).

At the time of the selection at issue, Mr. Giddens had only been employed by the Agency for five months and did not meet the one-year of specialized experience requirement for the position. (See ROI, p.151). Nevertheless, the management officials ignored this requirement and allowed the selectee to be considered as a candidate by the selection panel. Mr. Giddens began his new job supervising an all-black mailroom staff, among whom was Mr. McQueen, the person charged with training Mr. Giddens in the mailroom. Each of the other employees had more mailroom experience than Mr. Giddens when he acceded to the position on May 21, 2001, only seven (7) months after he first entered the mailroom.

Although each of the panel officials cite Mr. Giddens' supervisory experience as evidence of his leadership qualities, Mr. Giddens' application for the position shows that this experience relates to a retail position he held for six months prior to working in the mailroom. (See ROI, p. 151). Mr. Giddens' application also detailed his work experience as an Army sergeant performing Advanced Trauma Life Support, which also does not appear to be closely related to the duties of the supervisory mailroom position.

Mr. McQueen's position application also showed Army experience relatively unrelated to the position description of the lead mail clerk. (See ROI, p. 161). However, Mr. McQueen's application detailed the experience he acquired after seven years of service in the mailroom. (See id.). Further, Mr. McQueen had been entrusted with the task of training all new employees in the mailroom, including Mr. Giddens. (See ROI, p. 99). In spite of this clear evidence of leadership as directly relates to the position, the selection panel declined to consider Mr. McQueen's seven-year history with the mailroom.

When Mr. McQueen discovered that he had been passed over for the supervisory position in favor of an unqualified white applicant, he questioned the Agency's selection during a mailroom staff meeting with local management on May 23, 2001. (See ROI, p.99). During this meeting, Chief Russell and Ms. Wasko threatened Mr. McQueen and his black co-workers for questioning whether race had been considered during the selection process by stating that they could be arrested and prosecuted in German courts for making slanderous remarks. (See ROI, p.99). Mr. McQueen stated in his affidavit that he felt threatened by Mr. Russell and Ms. Wasko during this meeting. (See ROI, p. 99).

As a result of the Agency's discriminatory actions, Mr. McQueen suffered emotional distress, anguish and pain and suffering. He experienced a loss of personal self-esteem, a loss of enjoyment of life, and the loss of esteem of his peers. Mr. McQueen was best qualified for the position, due to his experience, his acknowledged leadership among his co-workers and his managers' assignment of training duties to him.

In addition, Mr. McQueen suffered tremendous embarrassment and humiliation due to the rejection by the Agency of what appeared to be a certain promotion. He became withdrawn and moody, and it grew increasingly difficult for him to face his children and girlfriend. This humiliation and resulting depression manifested itself in a overall loss of enjoyment of life, particularly since Mr. McQueen's sixteen years of service appeared to be in vain. Eventually, Mr. McQueen was constructively forced out of the federal civil service thereby forfeiting his rights to the benefits he had accrued through his years of service.

Appellant initially contacted the EEO office on January 4, 2001. His final interview was conducted August 3, 2001. Appellant filed his formal complaint of discrimination on August 14,

Page -8-

2001. The Agency issued its final decision on August 2, 2004.

## III. ARGUMENT AND CITATIONS OF AUTHORITY

### A.    Standard of Review and Burden of Proof

Appeals of Final Agency Decisions on the merits of individual complaints pursuant to 29 C.F.R. § 1614.110(b) shall be reviewed <u>de novo</u>. <u>See</u> U.S. Equal Employment Opportunity Commission Management Directive 110 (hereinafter "MD-110"), chpt. 9.

> The de novo standard requires that the Commission examine the record without regard to the factual and legal determinations of the previous decision maker. On appeal the Commission will review the documents, statements, and testimony of record, including any timely and relevant submissions of the parties, and the Commission will issue its decision based on the Commission's own assessment of the record and its interpretation of the law.

<u>Id.</u> Accordingly, the Commission is free to accept or to reject the Agency's factual contentions at will. <u>See, e.g., Jack K. Young v. U.S. Postal Service,</u> EEOC Appeal No. 01992198 (Feb. 13, 2002) (citing Equal Employment Opportunity Management Directive 110 at 9-15).

Mr. McQueen's ultimate burden of proof in this matter is to demonstrate by a preponderance of the evidence that the Agency's decision to not to select him for the supervisory mailroom position was based upon race. <u>Id., see also</u> <u>James Parker v. Department of the Army,</u> EEOC Appeal No. 01980592 (Jan. 14, 2000), <u>Alice Grappone v. Gordan R. England,</u> EEOC Appeal No. 01A10667 (Sept. 7, 2001), <u>Veronica L. Ford v. Social Security Administration,</u> EEOC Appeal No. 01974920 (Aug. 2, 2000) (citing <u>U.S. Postal Service Board of Governors v. Aikens,</u> 460 U.S. 711, 714-717 (1983)). Here, the preponderance of the evidence not only contradicts the rationale stated in the Final Agency Decision but also supports Mr. McQueen's assertion that race was more likely than not a motivating factor behind the Agency's selection decision.

**B.    Complainant's Qualifications Were Observably Superior To Those Of The Selectee, Indicating That The Agency's Alleged Reasons For Not Promoting Mr. McQueen Were Merely Pretext For Race Discrimination.**

The qualifications stated on the applications submitted by Mr. McQueen and the selectee establish that Mr. McQueen's qualifications were observably superior to those of the selectee, indicating that the alleged legitimate business reason for the selection were merely pretext for race discrimination. See Bauer v. Bailor, 647 F.2d 1037, 1048 (10th Cir. 1981); Williams v. Department of Education, EEOC Request No. 05970561 (August 6, 1998). In fact, the Agency's own EEO investigator, Mr. Jon Steinhilber, found that "the record contains no explanation as to the business necessity for employing such selection criteria." (See ROI, p.5).

Mr. McQueen was undoubtably qualified for the position. Overall, Mr. McQueen possessed the greatest amount of relevant experience for the position, due not only to his length of mailroom service, but also to his leadership role as trainer for new employees. (See ROI, p.161.). In fact, selection panel member Ms. Wasko testified that Mr. McQueen was the panel's second choice for the position. Mr. McQueen's application detailed the experience he acquired after seven years of service in the mailroom. Further, Mr. McQueen had been entrusted with the task of training all new employees in the mailroom, including Mr. Giddens.

Further, the evidence contained in the ROI indicates that Mr. McQueen was well liked, had received significant recognition for skills and other awards, and was given the task of training incoming personnel. In fact, ten minutes after being threatened by Ms. Wasko and Mr. Russell with arrest and prosecution for questioning the process by which the least qualified member of the mailroom received the coveted promotion, Mr. McQueen was presented with another award for fifteen years of hard work and commendable government service.

In contrast to these observably superior qualifications are those of the selectee. Although the Position Description required specialized experience of at least a year of mailroom experience, the selectee applied for the position during his first month of mailroom duty. Although the selection panel claimed to have been wooed by Mr. Giddens' "leadership capabilities," in reality this experience amounts to a low level supervisor position at the base retail store, experience that has absolutely no bearing on detailed and specific mailroom processes and procedures.

Mr. Giddens' application also detailed his work experience as an Army sergeant performing Advanced Trauma Life Support, which also does not appear to be closely related to the duties of the supervisory mailroom position. In fact, Mr. Giddens so lacked this experience that he was trained for his regular mailroom position by Mr. McQueen. Therefore, the evidence in the ROI establishes that Mr. McQueen's qualifications were observably superior to those of the selectee and that the Agency's reason for non-selecting Mr. McQueen was pretext.

**C.    The Alleged Legitimate Business Reason Proffered by the Agency Was Not Based Upon Any Objective Criteria.**

As the Agency acknowledged in its Final Agency Decision (hereinafter "FAD") of August 2, 2004, Mr. McQueen succeeded in establishing a prima facie case of racial discrimination under the McDonnell Douglas analysis. See FAD. The Agency correctly found that Mr. McQueen was a member of a protected class; that he was qualified for the Lead Mail and File Clerk (GS-0305-05) position but was not selected; and that the Agency instead selected Mr. David Giddens, a white applicant who was substantially less qualified for the position. Id.

The Agency has alleged that this decision was based upon a legitimate business reason, i.e., that the selectee was chosen "because he possessed the necessary background, including work experience closely related to the duties of the position, and because he had demonstrated the

Page -11-

potential for full performance in the position." See FAD. However, the ROI provides no objective evidentiary support of these bare assertions.

In fact, the selectee lacked the basic qualifications for the position and should not have been ranked by the Agency's selection panel at all. In addition, no evidence exists that would suggest that the selectee's experience as a medical trauma specialist in the military was "closely related" to the duties of a mailroom supervisor or even those of a mail clerk. Further, the selectee's ability to "demonstrate his potential" appears to be based solely upon the Agency's racially discriminatory decision to allow the selectee to participate in management meetings shortly after he first arrived on duty in the mailroom and before he was promoted.

1.

The selectee's failure to meet even the basic requirements for the position at issue established that he should not have been rated by the selection panel at all.

The OPM Qualification Standards Handbook states that in order for a candidate to be promoted to the GS-0305-05 position, that candidate is required to have one year of specialized experience, specifically "1 year equivalent to at least a GS-4." Specialized experience is defined as "experience that equipped the applicant with the particular knowledge, skills, and abilities (KSA's) to perform successfully the duties of the position, and that is typically in or related to the position to be filled. To be creditable, specialized experience must have been equivalent to at least the next lower grade level."

Here, the selectee had performed as a GS-4 in the mailroom for less than one month when he applied for the supervisory position at issue. The selectee's former position as a shift supervisor at the Army Air Force Exchange lasted only six months. Therefore, the selectee did not have the requisite one-year of specialized experience necessary to be eligible for the supervisory mailroom

position. In fact, the selectee should have been rejected as a candidate for the Lead Mail and File Clerk (GS-0305-05) position on this basis.

The Agency offered no justification for its decision to ignore this requirement and to permit the selection panel to consider and to rank the selectee. Instead, the Agency simply claimed that the selectee "possessed the necessary background, including work experience closely related to the duties of the position." See FAD. However, the bulk of the selectee's work experience was as a military medical trauma specialist, which certainly bears little resemblance to the specialized functions and duties of the mailroom where Mr. McQueen had worked for seven years. The selectee's six-month position as a shift supervisor at the Army Air Force Exchange appears to more similar to a retail position, such as working at a K-mart store. Thus, the Agency failed to establish any genuine link between the selectee's work experience and the position at issue that should have permitted his application to be considered by the selection panel, indicating that the respective races of the selectee and the four black candidates for the position provided the impetus to the Agency's decision to consider the selectee at all.

2.    The Agency designed the selection criteria to bolster the weak application of the selectee, who was the least-experienced and the only white candidate for the Lead Mail and File Clerk (GS-0305-05) position.

The Position Description for the Lead Mail and File Clerk (GS-0305-05) position established that 75% of the duties and responsibilities were specialized functions and duties that required abilities and other technical attributes consistent with the mailroom classification series, while the remaining 25% of the duties are those of a Team Leader and require leadership skills. This Position Description established that candidates with experience in the mailroom would receive ratings substantially higher than those without such experience.

Page -13-

However, the Agency chose as it selection panel rating and ranking criteria five categories that simply ignored the value of actual experience in the mailroom and of actual knowledge of the specialized functions and duties of mailroom clerks. These criteria appear to have been created for the benefit of the sole white candidate for the position, who lacked the specialized work experience of Mr. McQueen and of the other black candidates. One selection panel member, Ms. Fischer, admitted that she did not consider mailroom experience while rating the candidates, despite the Position Description's clear articulation to the contrary.

The Agency's own EEO Investigator characterized at least one of the criteria used as very subjective "because of the lack of specific criteria used in assigning a numerical rating." Further, the selection panel did not interview the candidates and rated the candidates based upon applications that were submitted to address the KSAs and Position Description, not the criteria invented by the Agency to provide the selectee with an advantage over the black employees, including Mr. McQueen, each of whom had greater mailroom experience than the selectee.

The Agency has alleged that the selectee's military experience and six-month stint in the base Exchange established that his leadership abilities were better than those of the other candidates. However, Mr. McQueen's application established that he also had substantial military experience, during which he received numerous decorations, including a Bronze Star, and that he received professional development training during his military career. See ROI, p. 161. Therefore, the selectee's military experience does not demonstrate objectively that the selectee was more qualified to lead than Mr. McQueen. Further, the Agency had recognized Mr. McQueen's leadership in the mailroom by assigning him to train new employees, including the selectee.

The evidence contained in the ROI established that 75% of the duties and responsibilities of the position at issue simply were not addressed by the subjective criteria rated by the selection panel. Therefore, the selection criteria used by the Agency appear to have been created to benefit the sole white candidate for the job by helping him to overcome his utter lack of mailroom or of substantially equivalent experience. Contrary to the allegation in the ROI that "Mr. Wait's opinion that the selectee had a 'clear advantage' because of his previous employment as a Army Sergeant and Shift supervisor" is simply illogical. The selectee did not have a clear advantage because of his experience, he was *given* a clear advantage by the Agency's employment of a biased, tailor made selection criteria. Moreover, the record proves that the Agency misrepresented the value of leadership skills required for the Lead Mail and File Clerk (GS-0305-05) position.

> 3. By allowing the selectee to participate in management meetings before he was promoted, the Agency provided opportunities for the selectee to demonstrate his potential and denied this opportunity to the black candidates for the supervisory position.

Immediately after the selectee arrived on duty in the mailroom in November of 2000, the Agency permitted him to begin attending management meetings where mailroom issues were discussed. This exposure provided a benefit to the selectee that was denied to the other candidates for the position, all of whom were not permitted to attend these meetings. In fact, this experience appears to have provided the selectee with the opportunity to demonstrate his "potential" for full performance of the supervisory position at issue, which the Agency then used to justify its selection decision.

This favorable treatment of the selectee began immediately after his arrival, although other mailroom employees certainly would have had more information and knowledge to contribute to a management meeting regarding mailroom issues at that time. Like the Agency's decision to permit

influenced her ratings of the candidates by explicitly instructing her to rate the selectee with top scores and to rate the black candidates with lower scores. Although the FAD declared that Mr. Russell's testimony that he did not have any input in the selection process was credible, the ROI revealed that Mr. Russell left his recommendation on behalf of the selectee with the selecting official/panel member before taking leave.

Finally, Mr. Baker, a former Agency employee and friend of Ms. Fischer, testified that Ms. Fischer confided in him regarding her actions throughout the selection process. Mr. Baker testified that Ms. Fischer first indicated that she intended to select Mr. McQueen. When Mr. McQueen was not selected, Mr. Baker questioned Ms. Fischer regarding this result. Ms. Fischer stated that she had made a "bad" mistake with her selection and confessed to being influenced by Mr. Russell to select Mr. Giddens. Ms. Fischer stated that Mr. Russell instructed her to give Mr. McQueen and his black co-workers a lower rating on at least one selection criterion and to give the selectee only top scores on all criteria. While Ms. Fischer remains an Agency employee, Mr. Baker is no longer subject to the authority of Mr. Russell and is a more credible witness for that reason.

This advocacy for the selectee by Mr. Zedalis and by Chief Russell appears to be preferential treatment. No explanation appears to exist for this preferential treatment other than the simple fact that the selectee was the only white candidate for the position. In fact, the selectee appears to have been brought into the mailroom as a clerk before the open position was announced for the sole purpose of ensuring that the supervisory position would not be filled by one of the black employees who were already working there. Therefore, the preponderance of the evidence supports Mr. McQueen's claim that race was more likely than not the determining factor in the Agency's decision not to promote him.

**D.    Mr. McQueen Suffered Harm Due To the Agency's Discriminatory Decision Not To Promote Him To The Supervisory Position At Issue.**

Mr. McQueen left federal employment effective December 31, 2002, believing that his sixteen years of federal service had been in vain because the Agency had blocked his efforts to advance beyond the GS-4 level. Although the loss of earnings caused by the non-selection was only $1,981 per year, Mr. McQueen suffered substantial non-pecuniary harm as a result of the Agency's discriminatory actions, including emotional distress, anguish and pain and suffering. Further, Mr. McQueen's advancement within the Agency was stymied as a result of his inability to obtain GS-5 experience stemming from Agency's discriminatory non-selection.

Due to the Agency's rejection of his application for what appeared to be a certain promotion, Mr. McQueen lost the esteem of his peers and suffered tremendous embarrassment and humiliation. He became withdrawn and moody and found it increasingly difficult to face his family members. This humiliation and resulting depression manifested itself in a overall loss of enjoyment of life and of personal self-esteem.

Based upon this harm, Mr. McQueen hereby requests an award of compensatory damages for his non-pecuniary damages, of backpay and lost benefits through his date of voluntary resignation and of his reasonable attorneys' fees and costs.

## IV. CONCLUSION

The objective evidence in this case strongly contradicts the Agency's rationale for not selecting Mr. McQueen and for instead selecting the only white candidate for promotion to a supervisory position in the mailroom where Mr. McQueen had worked for seven years. Indeed, the preponderance of the evidence supports Mr. McQueen's assertion that the Agency's decision was based upon race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§

200e et seq. Therefore, Mr. McQueen hereby requests that the Final Agency Decision in this matter

be reversed and that the Commission award to Complainant the damages listed above and such other

relief as the Commission deems appropriate.

Respectfully submitted this 12th day of October, 2004,

MELVILLE JOHNSON, P.C.

Christopher D. Vaughn
Georgia Bar No. 726226

44 Broad Street, N.W.
Suite 222, The Grant Building
Atlanta, Georgia 30303
Voice: 404.524.9111
Facsimile: 404.524.6611

UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS

| | | |
|---|---|---|
| JULIUS MCQUEEN, | ) | |
| Appellant, | ) | |
| | ) | EEOC Appeal No. 01A46062 |
| v. | ) | |
| | ) | Agency No. BXHMFO016130290 |
| THOMAS E. WHITE, SECRETARY, | ) | |
| U.S. DEPARTMENT OF THE ARMY | ) | |
| | ) | |
| Appellee Agency. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

Appellant hereby certifies that undersigned counsel served Appellant's Brief in Support of

Appeal via first class mail, postage pre-paid, addressed as follows:

Robert B. Kelso, Esq.
Office of the Command Judge Advocate
Headquarter, 5th Signal Command
CMR 421
APO AE 09056

This 12th day of October, 2004.

MELVILLE JOHNSON, P.C.

Christopher D. Vaughn
Georgia Bar No. 726226

44 Broad Street, N.W.
Suite 222, The Grant Building
Atlanta, Georgia 30303
Voice: 404.524.9111
Facsimile: 404.524.6611

Page -20-

2004 WL 3070656 (E.E.O.C.), EEOC DOC 1A46062
E.E.O.C.

*1 Office of Federal Operations

JULIUS MCQUEEN, COMPLAINANT,
v.
R.L. BROWNLEE, ACTING SECRETARY, DEPARTMENT OF THE ARMY, AGENCY.
Appeal No. 01A46062
Agency No. BXHMFO016B0290

December 22, 2004

DECISION

Pursuant to 29 C.F.R. § 1614.405, the Commission accepts complainant's appeal from the agency's final decision in the above-entitled matter. Complainant alleged that the agency discriminated against him on the basis of race (African-American) when he was not selected for promotion to a GS-305-05 Lead Mail and File Clerk position.

After a review of the record in its entirety, including consideration of all statements submitted on appeal, it is the decision of the Equal Employment Opportunity Commission to affirm the agency's final decision because the preponderance of the evidence of record does not establish that discrimination occurred.

STATEMENT OF RIGHTS - ON APPEAL RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:
1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or
2. The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

*2 You have the right to file a civil action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, filing a civil action will terminate the administrative processing of your complaint.

FILED

05 1650 AUG 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

PLAINTIFF'S
EXHIBIT

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

For the Commission:

Carlton M. Hadden
Director
Office of Federal Operations
2004 WL 3070656 (E.E.O.C.), EEOC DOC 1A46062
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.