**EXHIBIT F**

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JULIUS MCQUEEN,

    Plaintiff, CSAi JMT
        UNi+ 69905
        APO AE 09357

v.

**FRANCIS J. HARVEY, ACTING
SECRETARY, U.S. DEPARTMENT
OF THE ARMY**

    **Defendant.**

CASE NUMBER  1:05CV01650

JUDGE: Gladys Kessler

DECK TYPE: Employment Discrimination

DATE STAMP: 08/16/2005

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND EQUITABLE RELIEF

COMES NOW Plaintiff, Julius McQueen, and hereby files the following Complaint For Damages and For Declaratory and Equitable Relief against Defendant, PR Newswire Association, Inc., and states as follows:

## I. PRELIMINARY STATEMENT AND BACKGROUND

Plaintiff brings this action pursuant to 42 U.S.C. § 2000e et seq., for race discrimination.

## I. <u>JURISDICTION AND VENUE</u>

1.

The original jurisdiction of this Court is invoked pursuant to its original jurisdiction over federal questions, 28 U.S.C. § 1331. Plaintiff filed an Appeal of the Agency's Final Order with the Equal Employment Opportunity Commission, Office of Federal Operations, on October 12, 2004. <u>See</u> Appellant's Brief In Support of Appeal, attached hereto as Exhibit 1. The EEOC issued its Decision granting Plaintiff the right to file a complaint in the U.S. District Court on December 22, 2004. <u>See</u> the EEOC's Notice of Decision, attached hereto as Exhibit 2.

3.

Venue lies in the District of Columbia under, pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965.

## III. <u>PARTIES</u>

4.

Plaintiff is a former employee of the Department of the Army. Plaintiff's legal address is: Mr. Julius McQueen, CSA/JMT, Unit 69905, APO, AE 09357.

5.

Defendant Department of the Army may be served through Attorney General

Page -2-

Alberto Gonzales, U.S. Department of Justice, Room B-103, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001.

## FACTUAL ALLEGATIONS

6.

In 1994, Plaintiff (hereinafter "Mr. McQueen") began working for the 43rd Signal Battalion, Network Service Center of the United States Army in Heidelberg, Germany, as a Mail and File Clerk, GS-0305-04.

7.

Mr. McQueen is a member of a protected class (Black) under Title VII of the Civil Rights Act of t 1964.

8.

Throughout his employment with the Agency, Mr. McQueen received only "Excellence" ratings on his performance appraisals and he received cash awards for his performance on the job.

9.

Due to this exemplary performance and experience in the mailroom, the Agency assigned Mr. McQueen to the leadership role of training incoming personnel in

mailroom duties.

10.

In November of 2000, the Agency hired Mr. David Giddens, who became the only white mailroom clerk at his duty station at that time.

11.

Mr. McQueen assisted with training Mr. Giddens and familiarizing him with the ins and outs of the mailroom.

12.

Immediately after Mr. Giddens' employment began, the Agency permitted Mr. Giddens to participate in meetings with management on mailroom-related issues, although, Mr. McQueen and the other mailroom clerks were excluded from these meetings.

13.

The Agency allowed Mr. Giddens to apply for a Top Secret security clearance after he had worked in the office for only one week.

14.

When Mr. McQueen requested the opportunity to upgrade his security clearance to Top Secret, Ms. Anne Fischer, Supervisory Management Assistant, and  Mr.

Ronald Zedalis, Security Assistant/Chief of NATO Sub registry, denied his request.

15.

When Mr. McQueen questioned Ms. Fischer about this disparate treatment, she said that she would provide an answer at a later date but never did.

16.

In January of 2001, approximately two months after Mr. Giddens' arrived on duty, a Lead Mail and File Clerk position (GS-0305-05) became available at the 43rd Signal Battalion.

17.

The Qualifications Standards Handbook, Group Coverage Standard for Clerical and Administrative Support Positions, Specialized Experience and Education Requirements and the Vacancy Announcement, requires for the Lead Mail and File Clerk (GS-0305-05) position at least one (1) year of specialized experience equivalent to at least GS-4 or 4 years above high school.

18.

Mr. McQueen had more than one year specialized experience as a Mail and File Clerk, GS-4.

19.

The selectee, Mr. Giddens, had only 4 months of specialized experience in mailroom operations and did not have 4 years education above high school level, therefore, he did not meet the requirements for the position.

20.

This requirement of specialized experience in the mailroom was commensurate with the Position Description, which established that 75% of the duties and responsibilities of the position involve a variety of specialized functions, abilities and other technical attributes consistent with the mailroom classification series.

21.

The remaining 25% of the job duties and responsibilities are those of a supervisor/team leader and require leadership skills.

22.

The leadership duties included functioning as a bridge between mailroom employees and Agency management.

23.

When the position became available, Ms. Fischer advised all the mail room employees of their potential candidacy.

24.

Mr. McQueen was one of four black candidates for the position, for which Mr. Giddens also applied.

25.

Typically, when federal applicants lack the basic qualifications for a position, their applications are not presented to a selection panel for consideration.

26.

Of the five candidates presented to the selection panel, only the selectee, Mr. Giddens, lacked the requisite one-year of specialized knowledge.

27.

Mr. Giddens had less experience than any of the black candidates presented to the panel, especially Mr. McQueen.

28.

Overall, Mr. McQueen possessed the greatest amount of relevant experience for the position, due not only to his length of mailroom service, but also to his leadership role as trainer for new employees.

29.

The Agency assembled a selection panel to rate and rank these candidates for

the Lead Mail and File Clerk position.

30.

The panel consisted of Ms. Anne Fischer (Race: Slavic-Croatian), Supervisory Management Assistant; Ms. Jeanne Wasko (Race: Caucasian), Senior Management Advisor; and Mr. Frank Robert Waitt (Race: Caucasian), Chief of the Network Operations Branch, selecting official.

31.

Mr. Waitt served in a dual capacity as both a selection panel member and as the Selecting Official.

32.

Chief Kendal Russell apparently served as the recommending official and was not on the selection panel.

33.

Mr. Russell left his recommendation to select Mr. Giddens with Ms. Fischer and Mr. Waitt before he took leave, and the selection took place during his absence.

34.

The selection panel members each assigned a numerical score on a ten-point scale to each candidate on various selection criteria. Defendant alleges that these

numerical scores established that it selected the best candidate for the Lead Mail and File Clerk (GS-0305-05) position.

35.

Mr. Ronald Zedalis, Security Assistant/Chief of NATO Sub registry, admitted that he had "a great deal of influence" in the selection of Mr. Giddens, although Mr. Zedalis was not a selection panel member and had no official role in the selection process. Mr. Zedalis stated that he felt compelled to "talk up" Mr. Giddens to Ms. Fischer and Mr. Russell.

36.

Mr. Zedalis was responsible for delivering assignments from Ms. Fischer to the mailroom employees.

37.

The selection criteria used by the panel failed to include any of the required skills for the Lead Mail and File Clerk (GS-0305-05) position outlined in the Vacancy Announcement, the Position Description or the Qualification Standards Handbook.

38.

The selection criteria used by the panel placed no value upon actual experience in the mailroom even though the position description explicitly demanded this

experience.

39.

The selection criteria failed to address any of the technical qualifications for the position at issue, in which each of the black candidates and, particularly, Mr. McQueen far exceeded the selectee.

40.

Panel member Ms. Fischer admitted that she did not consider mail room experience at all in making her selection.

41.

The Agency's own EEO investigator found that "the record contains no explanation as to the business necessity for employing such selection criteria." In addition, the use of criteria such as "Potential for Growth" was deemed entirely subjective by the Agency's EEO Investigator, "because of the lack of specific criteria used in assigning a numerical rating."

42.

The Agency did not conduct interviews with the candidates during its selection process.

43.

As a result, the significant experience that made Mr. McQueen the most-qualified candidate for the Lead Mail and File Clerk (GS-0305-05) position was simply disregarded by the selection panel.

44.

Ms. Fischer also confided in her friend, Mr. Donald Baker, former employee of the 43rd Signal Battalion, about the selection process.

45.

Mr. Baker testified that he and Ms. Fischer had numerous conversations regarding the respective qualifications of the candidates for the position and that Ms. Fischer indicated that she intended to select Mr. McQueen for the position.

46.

When Mr. Giddens was selected for the position, Mr. Baker questioned Ms. Fischer regarding the selection. Ms. Fischer admitted to making a "bad" mistake with her selection, while additionally admitting to being influenced by Mr. Russell to select Mr. Giddens.

47.

Further, Ms. Fischer admitted that Mr. Russell instructed her to give Mr.

McQueen and his black co-workers a lower rating on at least one selection criterion and to give the selectee only top scores on all criteria.

48.

Panel member, Ms. Wasko, stated in her affidavit that the selectee was chosen because of his leadership abilities.

49.

The Agency EEO investigator notes in his report that Ms. Wasko "should have been painfully aware that there is absolutely no team leader/leadership requirement necessary as a prerequisite for the position. The position is clearly clerical requiring extensive mailroom knowledge and experience."

50.

He further noted that Ms. Fischer appeared to be taking the "standard agency Team Leader position" in her testimony by "emphasizing a qualification which is not required but which will substantiate and justify the selection of the selectee."

51.

Ms. Wasko confessed that Mr. McQueen was the second choice of the panel for the position after the selectee.

52.

The Agency EEO investigator commented on this statement by noting, "it is interesting to note that her testimony attempts to justify the selection of a candidate who did not possess even the minimum requirements of a GS-5 position, and thus should not have been a candidate at all. She should have been aware of this blatant error. This lends credence to the Aggrieved's complaint that management as a whole conspired in every way possible to insure that the only white candidate, however unqualified, would be selected."

53.

At the time of the selection at issue, Mr. Giddens had only been employed by the Agency for five months and did not meet the one-year of specialized experience requirement for the position.

54.

Management officials ignored this requirement and allowed the selectee to be considered as a candidate by the selection panel.

55.

Mr. Giddens began his new job supervising an all-black mailroom staff, among whom was Mr. McQueen, the person charged with training Mr. Giddens in the

mailroom.

56.

Each of the other employees had more mailroom experience than Mr. Giddens when he acceded to the position on May 21, 2001, only seven (7) months after he first entered the mailroom.

57.

Although each of the panel officials cite Mr. Giddens' supervisory experience as evidence of his leadership qualities, Mr. Giddens' application for the position shows that this experience relates to a retail position he held for six months prior to working in the mailroom.

58.

Mr. Giddens' application also detailed his work experience as an Army sergeant performing Advanced Trauma Life Support, which also does not appear to be closely related to the duties of the supervisory mailroom position.

59.

Mr. McQueen's position application also showed Army experience relatively unrelated to the position description of the lead mail clerk. However, Mr. McQueen's application detailed the experience he acquired after seven years of service in the

mailroom.

60.

Further, Mr. McQueen had been entrusted with the task of training all new employees in the mailroom, including Mr. Giddens.

61.

In spite of this clear evidence of leadership as directly relates to the position, the selection panel declined to consider Mr. McQueen's seven-year history with the mailroom.

62.

When Mr. McQueen discovered that he had been passed over for the supervisory position in favor of an unqualified white applicant, he questioned the Agency's selection during a mailroom staff meeting with local management on May 23, 2001.

63.

During this meeting, Chief Russell and Ms. Wasko threatened Mr. McQueen and his black co-workers for questioning whether race had been considered during the selection process by stating that they could be arrested and prosecuted in German courts for making slanderous remarks.

64.

Mr. McQueen felt threatened by Mr. Russell and Ms. Wasko during this meeting.

65.

As a result of the Agency's discriminatory actions, Mr. McQueen suffered emotional distress, anguish and pain and suffering. He experienced a loss of personal self-esteem, a loss of enjoyment of life, and the loss of esteem of his peers.

66.

Mr. McQueen was best qualified for the position, due to his experience, his acknowledged leadership among his co-workers and his managers' assignment of training duties to him.

67.

In addition, Mr. McQueen suffered tremendous embarrassment and humiliation due to the rejection by the Agency of what appeared to be a certain promotion. He became withdrawn and moody, and it grew increasingly difficult for him to face his children and girlfriend. This humiliation and resulting depression manifested itself in a overall loss of enjoyment of life, particularly since Mr. McQueen's sixteen years of service appeared to be in vain.

68.

Eventually, Mr. McQueen was constructively forced out of the federal civil service thereby forfeiting his rights to the benefits he had accrued through his years of service.

## COUNT I
## DISCRIMINATION BASED ON RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, et seq.

69.

Plaintiff incorporates by reference paragraphs 1-68 of his Complaint as if fully set forth herein.

70.

Defendant's actions constitute willful discrimination based upon race, as expressly forbidden by the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1. Compensatory Damages

2. Equitable relief;

3. Liquidated damages;;

5. Attorney's fees and costs of litigation; and

6. Any additional relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff requests a jury trial on all questions of fact raised by this

Complaint.

Respectfully submitted this _____ day of March, 2005.

13 day of AUG, 2005

Mr. Julius McQueen

CSA/JMP Unit 69905
APOAE 09889
00965 613-2491
Germany